The next case today is Associacion Hospital del Maestro, Inc. et al. v. Norris Cochran, Appeal No. 19-1475. Attorney Roth, please introduce yourself on the record and proceed with your argument. Good morning. May it please the Court, Robert Roth from Hooper, Lundy & Bookman for the Plaintiff Appellant's 25 Puerto Rico Hospitals. I would like to reserve three minutes for rebuttal with the Court's permission. Yes. The hospitals are challenging the Secretary's failure to count any low-income Puerto Rico Medicare beneficiaries when calculating their Medicare disproportionate share hospital payment, also known as the DISH payment, under the Medicare Inpatient Hospital Prospective Payment System, which I will refer to as IPPS, and hopefully no more acronyms. The key to understanding this case is a working knowledge of the Medicare DISH payment so that the Court can understand why the Secretary's actions undermine the foundation of IPPS payments to Puerto Rico hospitals and thus are irrational. Judge Celia's decision in Maine Medical Center is a good place to start, noting that the hospitals that serve a disproportionately high number of low-income patients. This payment is necessary because IPPS payments are predetermined amounts that are based on the average patient, and lower-income patients are more costly a treat than the average because they are sicker, with higher incidence of diabetes, asthma, and other medical conditions. DISH payments are based on what's known as the disproportionate patient percentage, which is the sum of two fractions. The Medicaid fraction, which isn't at issue here, and the Medicare SSI fraction, which is at issue. The purpose of the disproportionate patient percentage is to determine what hospitals serve a disproportionately high number of low-income patients and thus qualify for a DISH payment. The disproportionate patient percentage also is used then to determine the amount of the payment. As Judge Celia noted, the higher the disproportionate patient percentage, the higher the DISH payment. But crucially, Judge Celia noted that the disproportionate patient percentage does not serve low-income patients. Rather, it is, his words, an indirect proxy measure for low-income. It is the mechanism that Congress enacted so that a hospital's share of low-income patients can be compared with other IPPS hospitals to determine whether the low-income patient load in that hospital is disproportionately high compared to all other IPPS hospitals. For low-income purposes, the Medicaid fraction captures the inpatient care that a hospital provides in a year to patients eligible for Medicaid, which is the government insurance program for poor people. But that fraction excludes people who are eligible for both Medicare and Medicaid because Medicare is for aged and disabled, but not for the poor. And so Medicare beneficiaries are counted for DISH purposes only if they are also entitled to Supplemental Security Income, or SSI, an income maintenance program for the aged, blind, and disabled with limited financial resources, which this Court knows quite well from its decision in U.S. v. Villegas-Medero. The Medicare SSI fraction is the percent of Medicare beneficiaries also entitled to SSI benefits at the time of their inpatient stay. This case arises because the SSI program, as you know, is not available to Puerto Rico residents. This does not mean that Puerto Rico doesn't have any low-income resident Medicare beneficiaries. Of course it does. It's poorer than any state. But because Puerto Rico's low-income Medicare beneficiaries are not entitled to SSI, the Secretary didn't count any of them. Didn't count a single low-income Puerto Rico resident beneficiary in the Medicare SSI fraction. This results in a disproportionate patient percentage that does not reflect the number of low-income patients served by Puerto Rico hospitals, which obviously defeats the very purpose of the DISH statute. Can I ask you one question? Are there any reasons why a low-income person would be ineligible for SSI benefits independent of being a Puerto Rico resident? Well, there are qualification requirements including their income test, their asset test, right? So on your view then, are you saying that it would be problematic for this fraction to be carried out without doing an inquiry into the – I mean, how does that – does the hospital that does the inquiry have to do an assessment of each individual person's qualifications for eligibility? In other words, how does it actually work in practice? Yeah, the way that it actually – They say if you're a person of a certain income status, we just treat you as SSI eligible whether you actually are or not except in the case of Puerto Rico or how does it work? I just don't understand. Yeah. Well, the way that it works, Judge Barron, is that HHS through the Centers for Medicare and Medicaid Services creates a list of Medicare beneficiaries and they send that over to the Social Security Administration keeps track of individuals who received SSI benefits and so they match up the Medicare beneficiaries who had inpatient stay with the months that they were getting SSI benefits through the data that's available through Social Security. Just so I'm clear on this, you keep using the phrase eligible for SSI. Is the actual phrase being a recipient of SSI or is it just being eligible? I'm using eligibility because that's crucial to this case but what the statute talks about is entitlement to SSI benefits and that's the thing that the Social Security Administration has in its database. So in other words, it has the months where they received the benefits and those are determined to be the months that – So that's what I'm saying. The statute seems written with an idea that it was going to turn on being an actual recipient of the benefits as opposed to merely being eligible for it. Well, I mean, as you know, your honor, the case law on eligibility versus entitlement in the dish area, there are dozens of cases that get into that question and the statute though speaks in terms of entitlement, right? I guess what I'm saying, aren't you reading it to be eligibility? Oh, no, no. I'm not reading it to be eligibility. I'm saying that it only makes sense if for Puerto Rico residents who can't qualify for entitlement because they're located in Puerto Rico. But then what I'm saying is what would we do? Would we count all of them? Because what you're saying is in the normal circumstance for people who can qualify, for the states who can qualify, they get a list of who's actually getting them. Yeah. Well, I mean – Now you're asking – What would we do for Puerto Rico? How would that work in Puerto Rico? We don't have that list. Well, I mean, first of all, well, if you're asking me how it would work from a kind of a governmental operational perspective, there's a number of ways to do that. For example, as our papers explain, Puerto Rico has the AABD program, Aid to the Aged, Blind, and Disabled, which is their equivalent, what they had, what everyone had before the changes in 1974. So one option, for example, it wouldn't be the same as SISI, but you could ask Puerto Rico to match it against the people who are entitled – But I'm still asking the same point, which is that that would be not equivalent to whether they would show up on the list if they were in a state where they were eligible. Well, it's not equivalent only in a way that prejudices Puerto Rico hospitals because everybody who is eligible for AABD benefits would be eligible for SSI benefits if they were in the states. So, yeah, you're right. It's not exactly a good measure because it prejudices and limits the payments to Puerto Rico hospitals. But you said nobody on that list would not be on the list that Social Security prepares if they were in a state where they could get the benefits. Oh, not even close. I mean, the qualifications in Puerto Rico are fractioned dollar-wise of what you have in the states on that point. In addition, it would be not much work at all for Puerto Rico to – or the hospitals for that matter, or the Social Security Administration to use the income and asset data that has been gathered by Puerto Rico to determine SSI eligibility and entitlement. So the operational barriers there are things that need to be addressed, but they are in no way prevent the government from being able to determine who would qualify, who would be entitled to SSI benefits. But the alternative here is to assume that there are no low-income Puerto Rico Medicare beneficiaries, which is irrational on its face. Of course there are such people, and the only reason that they're not counted is because Puerto Rico doesn't have an SSI program. So the facial irrationality of this is supported by the 2016 Federal Register document from the government where they did an analysis and they said nationwide for every hundred days, inpatient days of Medicaid eligibility of people who have Medicaid, there are 14 days of people who have SSI, who have the Medicare beneficiaries with SSI. So even the government acknowledges the prejudice to the Puerto Rico hospitals. And so the issue here then becomes whether the exclusion of the low-income Puerto Rico resident beneficiaries from the Medicare SSI fraction is lawful. Well, it's not. The government argues that there's Chevron step one. Well, it's clear from the language that to pay hospitals in Puerto Rico in the same manner and to the extent that they're paid in the states requires the exclusion of all low-income Medicare beneficiaries because Puerto Rico doesn't have an SSI program. Well, that doesn't make any sense because the whole purpose of bringing Puerto Rico hospitals under the IPPS, under the Inpatient Prospective Payment System, is to get away from a system that paid the hospital's costs. So this was supposed to be a money savings approach for the government. So they bring Puerto Rico into IPPS after they did a study. They didn't bring Virgin Islands. They didn't bring Guam. They didn't bring any other territory in, but they brought in Puerto Rico. And they said to Puerto Rico, come on in and we're going to treat you in the same manner and the same extent as the other hospitals in the states. And so what happens is every state, every state has low-income Medicare beneficiaries counted, but not Puerto Rico. So how is that being treated in the same manner? In addition, under a Chevron one analysis, if in fact Congress intended to bring the their dish payment, they would have said something about it. They wouldn't have used this in the manner and to the extent language. They simply would have brought them under the dish statute. And under the dish statute, they would have said, oh, you just treat them like everybody else. But that's not what Congress did. So it doesn't pass a Chevron study. Just so I understand that chain of logic, are there territories whose residents, in the other territories, residents also don't qualify for SSI? Well, I think from the Via Madero, I think that Northern Marianas can qualify for it. There's SSI benefits available in Northern Marianas, but that doesn't come under IPPS. Right, but other territories don't. Correct. Okay, and so the IPPS, being brought into IPPS is a predicate for them being eligible for the payments that you're seeking, is that right? That's correct. Was that done by statute that Puerto Rico was brought in? Yes, sir. Yes, yes. Originally, it wasn't part of the system. And this language, this to the extent and in the manner of, was that preexisting language at the time when Puerto Rico was brought in? No, Your Honor. That was added, in other words, in saying now that we've brought the Puerto Rico hospitals under IPPS, we need to treat them in the same manner and to the same extent that we treat hospitals in the States. Is there any legislative history on the meaning of those words? Because your want us to read those words as saying they're brought in and therefore you should be treated in a way not in the same manner in the sense that even though they're not getting the benefits, treat them as if they're getting the benefits. The other way to read it is they brought them in full well knowing that they'd be brought in with them getting a lower share because they would have a low income population that wasn't getting SSI benefits. Is there anything in the legislative history that tells us which of those two views, that speaks to the question of which of those two views Congress might have had in mind? Well, I mean, the one view you might be able to get to textually, but you cannot get to rationally because there would be no reason for Congress to say, come on and be under IPPS, but we're not going to give you a full dish payment. There's nothing that says that. The only thing that's different in the conference report is where the statutory language says in the same manner and to the extent, the conference report says in the same manner and to the same extent. So that's the only language that you have. Were there hearings about bringing Puerto Rico in? There was a report that was done that was commissioned when IPPS came in in 83, right, and said where they asked the secretary to weigh in to determine whether in fact any of the territories, including Puerto Rico, would be a place where IPPS could be extended because IPPS is seen as a good financially responsible program and the report came back and said that only Puerto Rico because of the patient population, the way the hospitals are paid, the cost that they get involved, all of those things, that the hospitals in Puerto Rico were appropriate for inclusion under IPPS, but the other territories were not. And that report doesn't make any reference to SSI eligibility? Well, that report, you see, IPPS came in in 1983, right, so Congress enacts it in 83. It begins in 10-1-83 and then there was a big fight, a huge fight, because hospitals that had low-income patients were incurring additional costs but not getting paid. So Congress asked the secretary to provide some kind of a dish payment, wouldn't do it, and so then effective 10-1-86 is when Congress enacted the dish benefit, but the Puerto Rico report was completed in the summer of 86 before the dish benefit had been enacted. So it's silent on the dish benefit. But it does, the statute does specifically say, specifically say, to the same extent in the matter and to the extent of the dish payment. So obviously Congress envisioned there being a dish payment and I understand your question and saying, well, was there anything that said we're going to count your dish payment the normal way? Well, of course there wasn't. What they said was we're going to take into account that Puerto Rico was special and there was nothing, nothing in the legislative history, in that report, in any publication of the government. When we asked for discoveries, we spent 10 years trying to get information out of the government and there is no document from the government that has ever explained why it is rational, why it is rational under the IPPS program to deny Puerto Rico hospitals the full dish payment. There is no reason. If you're going to bring these hospitals under IPPS, you have to pay them dish because that's what they need to be paid correctly. This is no windfall. This is no benefit. This is what is, this is how IPPS works. Right? So, so the, so there is no Chevron one, you know, to read. I have two last questions from just from me, which is just about the equal protection argument that you're making. Yes, sir. Is that an argument solely made on behalf of the patient population or is that made on behalf of the Puerto Rico hospitals? Well, in our, in our, in our brief, we, we cited both for standing because the Puerto Rico residents are obviously affected by the underpayment of their IPPS. But are you separately claiming that the equal protection violation harms the hospitals? Yes, we have that in our, in our brief. The secretary did not respond. I think that's deemed conceded and unopposed, but yes, we have both of those in, in our brief in chief and noted in the reply brief that the government didn't address those, those standing positions at all. Was there a second question, your honor? You said, well, I guess the second question is with respect to that equal protection argument is, as I understand the government's response to it, it's in part based on the argument that the Supreme Court is going to decide in this pending case right now, at least one version of the argument. So I just wonder, is there, if you have a view about what we should do in light of the court having that equal protection issue before it? Well, I mean, regardless, the outcome of Vieira Madero does not affect our case. What's crucial here in this case is that the court recognized that residents of Puerto Rico and Puerto Rico itself is a, is an appropriate subject for an equal protection argument. There has never been a hospital, never. I guess what I'm saying, it's possible the Supreme Court would disagree with that. It's possible that the Supreme Court could disagree. In light of that, do you have a view about whether we should just wait until we hear from the Supreme Court about whether that predicate point that there is an equal protection problem that's even possible before we weigh in or not? Well, it seems to me that if the, if the court finds that this is a Chevron one case, then you, then it works, then it walks into the potential constitutional case, right? And so maybe we wait and see what goes on there, but this isn't a Chevron step one case and it fell and the government's policies and actions fail under Chevron step two and also fail because they didn't take the APA. So if the, if the court wants to raise this to a constitutional dimension, which is what the government's argument would require you to do, then maybe you should, maybe you should wait. But the, but, but we believe that as we talked about in our brief, that under the, under the doctrine of constitutional avoidance, that the court doesn't have to force a constitutional confrontation on this statute because it simply doesn't say anything about SSI. It doesn't say anything about underpaying Puerto Rico hospitals. And in addition, the irrationality that defeats the, the, the secretary's actions under Chevron step two would also defeat the secretary's actions under mutual protection analysis. So under both of those circumstances, you're going to get to the same place under Chevron step two. So we think that the court can proceed, but if it focuses on only the the, the Chevron step one in the language of the statute, then it may have, then it may, it may be in the, in the, in the court's interest to wait and see what the, what the court does on the equal protection question in Vallejo, Medellin. Thank you, Mr. Roth. Thank you, Your Honor. We will hear from Ms. Dixon. If you would mute your video and audio, Mr. Roth. Good morning. May it please the court, Courtney Dixon for the secretary. Congress directed that the statutory provisions relating to disproportionate share hospitals shall apply to Puerto Rico in the same manner those provisions apply to state hospitals. As this court recognized in the medical center, the dish statutory provisions are apparently clear. They prescribe a statutory formula and the fractions within that statutory formula are also statutorily fined. So with that plain language, the secretary has applied the same statutory formula to calculate dish payments for Puerto Rico hospitals. The secretary applies to state hospitals without any atextual exception. I think I've said that the statute says that the same dish payment should apply. That's not what the statute says. And plaintiffs are asking for an atextual exception to the statute. Can you just go through with me the same history that I was trying to recount with your opposing counsel? Because I think it would help me get the context of this. Yes, certainly. The key language, and I understand your textual argument about that language, which is this to the extent and manner language. That language appears when with respect to Puerto Rico being brought into the program that would allow these hospitals to get any benefit at all. These are the language including Puerto Rico in the prospective payment system. So they're in the same manner. And to the extent language is in a preparatory clause to several statutory provisions. Congress is saying we're including Puerto Rico in the prospective payment system. The following provisions apply to Puerto Rico in the same manner and to the extent they apply to state hospitals. And then just walk me through when the decision was made to bring Puerto Rico in with that language. Is there any report, legislative history beyond the text that illuminates whether this issue was discussed by anybody about whether in doing that the understanding would be that all the low income people that are counted in all the other states would not be counted even though Puerto Rico was being brought in with language that you might think was a signal that they were going to be treated the same way. So a few responses to that. First, so the primary piece of legislative history here is the secretary's report. The secretary finalized that report in the summer of 1986. That was after these DISH provisions had been enacted earlier in 1986. And if we look at the secretary's report, you know, the secretary finds that in general the prospective payment system is compatible with Puerto Rico and recommends Puerto Rico be included in the prospective payment system. But the secretary noted that Puerto Rico hospitals were not identically situated to state hospitals. In the joint appendix at page 83, the secretary notes that Puerto Rico hospitals across the board, even when adjusting for other factors, had costs that were 42.5 percent lower than state hospitals. The secretary's report also notes that at the time, public hospitals in Puerto Rico treated patients on public benefits assistance, and then there were other hospitals in Puerto Rico who treated other patients. The secretary's report concludes that there didn't seem to be a large cost differential between the public hospitals in Puerto Rico treating predominantly low income patients and other hospitals in Puerto Rico. So to answer your honor's question, there wasn't specific language in the secretary's reporting, you know, the things that we're discussing today. There are, you know, factual bases in the secretary's reports, which Congress could have looked at and thought, you know, we're applying these same provisions to Puerto Rico, these provisions that set forth an administrable standard that is a statutory formula that we can verify. And Congress could have rationally believed there wasn't a reason to go in and tinker with that further to make sure that Puerto Rico got a greater adjustment under this system. Because of course, the purpose of the prospective payment system is to, you know, not to overcompensate hospitals or else that could kind of, that could ruin the purpose of the system, which is supposed to incentivize cost savings. And if I could just say one thing to your honor's point, I think at the end there, you know, this isn't a circumstance in which applying the statutory formula to Puerto Rico hospitals means that Puerto Rico hospitals can't get disproportionate share hospital payments. You know, we might have further questions in that circumstance about, you know, why would Congress have done this, et cetera. That might be a harder case. I mean, Puerto Rico hospitals can and do receive dish payments. Many of the plaintiff hospitals in this case receive hundreds of thousands of dollars in payment. There's the Medicaid fraction, of course, which Puerto Rico residents are eligible for Medicaid. And a Puerto Rico hospital's Medicare SSI fraction isn't also necessarily zero. We acknowledge that it's lower, but Puerto Rico hospitals can treat patients who are eligible for SSI that might be eligible, for example. So I don't think that we're at a level, of course, of absurdity where it's like, well, how could Congress not have thought that it could ever have possibly wanted to do this? Of course, there are, we look back at 1986. There are several reasons why, again. Counselor, can I just, it's something you just said. I want to just make sure I understand that Puerto Rico hospitals can treat SSI eligible. You're talking about visitors? Certainly, your honor. Yes. And that gets captured in the reporting from the hospital. I thought the reporting was, you know, was done by Social Security. So the hospital will itself report which of its recipients are SSI eligible? Well, I think, you know, the actual details of the cost reports and the verifying, I don't want to, you know, get too far out in front of my skis trying to explain all of that, but hospitals submit cost reports to Medicare. I just want to know how HCFA or whoever the appropriate agency is knows that they treated SSI eligibles based on your statement. I believe that hospitals would submit cost reports to Medicare in that circumstance and then verify. So the hospitals capture that information that somebody is SSI eligible? Again, I don't want to overstate the exact mechanisms. Well, I'm trying to find out if you've overstated in the first place. I just want to know. Well, your plaintiffs here have reported or it's in the record. Plaintiffs have stated what their Medicare SSI correction is, and then they've stated they tried to compare that to state hospitals. All I'm trying to, it's just a very fine point. I just want to understand your assertion that Puerto Rico hospitals can be reimbursed for SSI people that they treat. Right. I think that's confusing. How does that work? How does the agency get that information? That's all I'm asking. I believe hospitals in their cost reports are submitting that information to the agency. If there's further questions on this, I'm happy to move. I'm hesitant to, again, get out too far in front. I know, but you made the statement, and I want to know if you stand by the statement. And if you do, what's your basis for it? I stand by the statement, Your Honor, that the Medicare SSI correction for Puerto Rico hospitals is not zero. That's undisputed. The hospitals in this case, in the record, have stated what their Medicare SSI correction is. It's smaller than the Medicare SSI correction for state hospitals. We don't dispute that. My only point is that the Medicare SSI correction is not inevitably zero for Puerto Rico hospitals. And, of course, there's the Medicaid correction. So my only point is that it's not the circumstance that this is zero in every case, and it's certainly not the circumstance, Your Honor, that Puerto Rico hospitals don't receive dish payments or that they're categorically ineligible for dish payments. That's just not the case. At the risk of – I know I'm oversimplifying, and I apologize. But from what all you're saying in answer to these questions, it strikes me that the answer is no. No one, from the Secretary to anyone in Congress, legislative history, no one ever sat back and said, you know, we recognize that as a practical matter, that Medicare SSI fraction means – or substantively, it means Puerto Rico's hospitals are not going to get any payments, any dish payments under that fraction, excluding the guy from Miami who's traveling who happens to be on SSI and gets sick on the street, excluding that. But as a general, nobody's ever said, oh, no, this formula is simply going to rule out that fraction with respect to dish payments to Puerto Rico. So here's my question. If that's the case, is there some reason why the Secretary wouldn't be allowed to use the language in the same manner and to the same extent to say, well, obviously, Congress meant Puerto Rico hospitals to get dish payments under this program to the same extent. Find some way to, from an administrator point of view, interpret the fraction to mean not necessarily SSI eligible but otherwise SSI qualified but for their Puerto Rico status, something like that. I think that's what they're driving at, isn't it? The statute directs the Secretary to apply the statutory provision. Well, you know, I'm reminded of a case, frankly, that I had and I was involved in where the statute said, Congress, we're going to regulate unsolicited faxes and you're going to pay a fine if you send unsolicited faxes to me. And the FCC construed that statute in the regulation to mean we're also going to regulate solicited faxes, even though Congress said unsolicited faxes. So I'm just wondering, this seems a little more palatable in terms of in the same manner and to the same extent Puerto Rico hospitals are to get dish payments. I apologize if I sound like a broken record. The statute directs that the provisions apply, not necessarily an equivalent payment amount. And if I could refer again to this court's opinion in Maine Medical Center. Can I just ask you about that? Just walk me through the textual point. You need it to be so clear that Judge McAuliffe's alternative reading is just not plausible. And so I just don't quite know why the word provisions is doing all that work. It's true that they're talking about the provisions and the provisions have to be applied. But I guess the question is, why doesn't the word to the extent give you some room about how to apply those provisions that might give room for this practical point to be accounted for? I could go back to maybe the end of Judge McAuliffe's question, which I think is also a question to your Honor's point here. And that gets me as well back to Maine Medical Center. I mean, in Maine Medical Center, this court said the statute is transparently clear. At a minimum, it's reasonable for the secretary to follow the most evident interpretation of the statute rather than develop some other methodology. That's the same position that we're in here. But that's a different, that's a separate issue about how to apply Chevron. And that goes to whether we think the secretary thought it was bound to do this or whether the secretary thought in its discretion it was choosing the most natural reading. I want to put that aside. Assume the district court, the secretary is read to have thought it was bound to adopt this reading. Then there might be a problem if in fact it had discretion to adopt alternative reading. So with respect to that issue, whether it had any room to adopt an alternative reading, could you just tell me why the textual use of the word provisions precludes the secretary from having that discretion? I understand that maybe the secretary should be affirmed even if it had that discretion. But I just want to know whether, you seem to be arguing it doesn't have the discretion at least as one argument, and I want to know what the reason for that is. Your Honor, even if the secretary has discretion, I think the call to me that you were having No, no, no. I don't want you to talk about that. I want you to answer the question about whether it had the discretion. Step one argument is that the secretary had no discretion to do what Judge McAuliffe was suggesting the statute might allow it to do. That turns on the text and the use of the word provisions, according to you, and I want to understand why the use of the word provisions requires that conclusion. Certainly, Your Honor, and I didn't intend to be pushing back. I just want to get to the heart of what I'm... Certainly, and I think it goes to the structure of the statute here, which is that when Congress brought Puerto Rico into the prospective payment system, there's the statutory language, okay, Puerto Rico is included, the following provisions apply to Puerto Rico in the same manner to the extent, and then there are several provisions there. Certainly the most evident interpretation of that is that these provisions apply to Puerto Rico. Where Congress wanted there to be different rules that apply to Puerto Rico, Congress said so explicitly. Congress specified a different base payment rate for Puerto Rico hospitals than applies to state hospitals, and Congress didn't apply to Puerto Rico hospitals the provisions related to sole community hospitals and referral centers. Of course, generally, we presume that Congress, you know, says in the statute what it means, it means in the statute what it says, and... But do you see a conflict there, a conflict between the supposed intent and purpose of the program and your construction of the language? In other words, I'm a Puerto Rico hospital. I say I'm going to be treated to the same extent in the same manner as state hospitals, which means I'm going to get dish payments for my disproportionate share of paying for poor care, and then I wake up the next day and say, well, wait a minute, no, I'm not. No, I'm not, because Puerto Rico doesn't have SSI-qualified Medicare recipients. A few responses to that. First, to go back to our discussion of the secretary's report, Congress, you know, we're talking about a federal benefits program, and within that, an additional adjustment on top of that. That's supposed to correlate roughly with the amount of low-income patients a hospital treats, but that formula is necessarily imprecise. This court recognized that to be true as much in Maine Medical Center. Of course, of course it is. It is, because you're not going to capture all the poor care that you pay for by any stretch. You've got surrogate formulas, of course. Everybody understands that. But if I'm in one of the 50 states, I'm going to get a positive number that's somewhat representative, if not exact and not precise. If I'm Puerto Rico, I'm getting zero. And again, it's not that you're getting zero. No, of course not. But I'm not taking into account visitors who come from Miami and get sick while they're on the cruise ship. You know, that's de minimis in my view. So just assume substantively zero. The Medicaid fraction as well. But to get to, I think, the thrust of your honor's point, you know, again, so we have this line-drawing metric that Congress has created for dish payments, a statutory formula that's easily administrable. It's rational that Congress would choose to apply that to all hospitals that are within this system, not if all hospitals qualify to some degree, but one never qualifies. Well, I think that gets us back to, you know, the facts that Congress had before it at the time. Congress could have made a rational, predictive judgment. I don't disagree. Of course they could have. And the question is, did they? And to judge Barrett's questions, and I'm interested as well, did anybody ever wake up and say, hey, you know what? We've overlooked something here. We've just excluded Puerto Rico from the fraction. We've just totally excluded them. They're never going to get anything. Did anybody ever take note of that? I would suggest that maybe they thought about it. But what you're arguing is, oh, of course they thought about it because they never said anything. I'm saying, of course they didn't think about it because they never said anything. I guess for our present purposes, your honor, assuming they did or did not sit and scratch their head about this particular problem, I mean, the statutory language is clear, and the secretary has been implementing that statutory language for 30 years. The next question, what's your rational basis for saying, we're not going to give Puerto Rico any payments under the fraction requiring Medicare SSI, but we're going to make substantial payments to every other hospital as long as you're in the 50 states? Well, I would go back, your honor, if we're talking about a rational basis for Congress to have done this in the first instance. I mean, at least that, doesn't it? Yeah, certainly, your honor. And, again, as I was noting, the fact that this is a federal benefits program that Congress has to administer and it necessarily has to do an exercise in life, it's rational that Congress would apply the same formula to all hospitals within the system, particularly when the information that Congress had before it at the time that it included Puerto Rico in this system was that Puerto Rico hospitals across the board can significantly lower hospital costs. But they already took care of that because they adjusted the formula down where they adjusted the reimbursement formula, a blended 75%, 25% formula. Your honor, that certainly is another instance in which Congress might have taken this into account. I don't know if that adjustment accounts for that entire 42.5% gap. But that was the explanation for it. That's what the secretary said. They said, you know, because their costs are lower and they're more efficient and so on and so on, we recommend in Congress that you give them a lower reimbursement basis. And here it is. Here's a proposal. 75%, 25% sounds good to us. Congress says, yeah, okay, we'll go along with that. So they've already adjusted for that, right? Again, I don't know, your honor, if that adjustment makes up for the entire gap. It may not, but the secretary said it's good enough and Congress said it will go along. And we're talking about whether Congress would have had a rational basis, your honor. We do have a rational basis for that. The secretary said they're efficient, they're lower cost. Here's my proposal. We don't know if it's exact. We don't know if it covers everything. But it's certainly rational. And so 75%, 25%. Congress says, okay, that takes care of the overpayment problem now. Now they're going to be treated just like everyone else, except they're not. Your honor, again, I think it's rational as a predictive matter that Congress could have rationally believed that the statutory formulas that it has created to have an administrable system for roughly approximating these low-income patients should apply to everyone in the system, rather than, and it might not have felt the need at the time, based on the information that it had before it, to go in and create a special rule for Puerto Rico where, again, I think the discussion- It's just an interesting question. I mean, I apologize, but it seems to me like you're telling a bunch of fifth graders, look, everybody's going to get a candy bar in the same extent, to the same manner, as long as you're a member of this class, except if you have blue eyes. And they say, well, I have a rational basis for that. I mean, you know, and you say, really? Did somebody say blue eyes makes a difference somehow? And, no, nobody said that. Now you're saying, well, every hospital is going to get dish payments under both fractional statements, except one group isn't. Why isn't that group isn't? And you said, well, they could have had a reason. I agree, they could have. They could have had no reason because nobody thought about it. And I guess that's what I'm trying to get to, is that basic problem. Did somebody ever say, look, you know you're excluding Puerto Rico in Congress in a manner of speaking. Yeah, we know, but there's a reason for that. I mean, Your Honor, you noted that Congress could have had a reason. For purposes of rational basis for you, that's enough. What would it be? What do you think it would be? I mean, the administrability point, I think, Your Honor, is a significant one. The idea that Congress necessarily had to do with line drawing and creating this formula. And it's rational that, especially at the time that Congress was enacting this, based on the information that it had before, Congress could have rationally believed that this generally administrable formula should be accounted for for all hospitals in the system rather than go in and create special rules for Puerto Rico. Because especially at the time that Congress enacted this, based on the legislative history, the Secretary of the Court, Congress could have rationally believed that it would need to keep the formula to give Puerto Rico even greater adjustment, given the facts it had before. Can I ask you one last question, which is, well, I guess two questions, really. One is, just going back to Chief Judge Howard's point about whether hospitals do the reporting of visitors, it might matter because if they don't, notwithstanding the record saying what it says, we don't understand how that could plausibly happen, then it's a bit of an odd formulation, the way it's written with respect to Puerto Rico, because the more natural way to write it would be to simply say you get a dish payment with a different fraction rather than say we're going to apply the same fraction, it's just yours is always going to have zero for part of it. So your answer to that is, well, actually it's not zero because they can get some payments for visitors, but then when we ask you, well, how does that actually happen, I understand you don't have an answer to that, but if we don't know how that actually happens, it's a little strange to credit the fact that this formula makes sense because it picks up the visitors if it doesn't pick up the visitors. I'm not sure I understand your Honor's question entirely. Well, you're saying that some Puerto Rico hospitals get reimbursed for some SSI beneficiaries, correct? The hospital will include in their SSI fraction the number of patient days attributable to patients who are entitled to Medicare Part A and entitled to SSI. Right, you're saying that that SSI number turns out not to be zero for Puerto Rico hospitals. If Puerto Rico hospitals treat patients entitled to Medicare Part A and entitled to SSI, those patients will be included in their Medicare SSI fraction. Correct, and then that's Chief Judge Howard's question to you. How does that fact practically happen? How do they know who it is? Because we thought Social Security was keeping the list. Now you're saying, no, actually it must come from the hospitals. Then we ask you, do the hospitals have that information? Do they supply it? Does it then get verified? And you say you don't know. That's fine that you don't know. I appreciate your candor, but it does then raise the question, in fact, was the formula designed in a way in which Puerto Rico's number would not be zero? Your Honor, hospitals submit cost reports to Medicare. It's my understanding that verification of that number happens behind the scenes through another process. But certainly hospitals are submitting their cost reports to a Medicare administrative contractor with respect to these payments. Okay, so that's why you would say that it didn't just write in saying, well, you only get it for half the fraction, not the other half, because they wanted to pick up the visitors? I think, Your Honor, I mean, again, a hospital who is treating patients entitled to Medicare Part A Okay, the other question I have for you was what you think we should do about the pending Supreme Court case, given that in your briefing to us, one of your arguments on equal protection grounds is that essentially the First Circuit analysis was wrong. Is that right? No, Your Honor, I don't. Well, then just tell me what you think we should do, given that there's a pending Supreme Court case on the equal protection issue concerning Puerto Rico that's somewhat related but not directly related. I don't think that Bayo Madero, whether or not the outcome there has a bearing here. It's not disputed in Bayo Madero, of course, that to the extent that there's a level of scrutiny that applies here, it's rational basis.  and not creating some atextual exception that's not mentioned in the statutory text or the legislative history. And, you know, we've been discussing Congress's rational basis here, and I won't get into all of that. Again, this isn't a circumstance like Bayo Madero, where, you know, Congress has said we're giving federal benefits and then not extending that to Puerto Rico, and you're judging the rational basis of that on its face. There's different arguments at play there than here. There's different factual circumstances at play here, of course, and that's what we've been discussing all of those today. I'll also just note briefly that Congress did make adjustments to the dish payment system in the Affordable Care Act in 2010. These formulas that we've been discussing today, those now make up 25% of a hospital's dish payment. The remaining 75% is now what's known as an uncompensated care payment. That's based on appropriate data as estimated by the secretary. So a chunk of the dish payment now, 75% of it, is not now these statutory formulas. That's not relevant for the fiscal years that is at issue in this case, but I think it is very relevant for the statutory interpretation question. Congress made revisions to these dish provisions. But Congress didn't enact the type of proposals here that plaintiff is insisting, and as Your Honor was discussing with plaintiffs, it's not even clear how that would work or be administrable in practice, which again just only underscores the rationality of the secretary's interpretation and Congress's choice. I'm happy to answer any other questions that the court has. Otherwise, we ask the district court to be affirmed. Thank you very much, Ms. Dixon. Thank you. Mr. Roth, you reserve three minutes. Yes, thank you. Thank you, Judge Howard. Let me just make the point with respect to administrability, non-issue. Government counsel was discussing what happened with the new change from the Affordable Care Act and what happens to the 75-25%. And what's in our brief is that the secretary said, well, look, for every 100 Medicaid days, there are 14 SSI days, and applied that to Puerto Rico. So there is no administrability problem because when required and facing actually doing something about this, there was no problem at all for HHS to figure out how to make it happen. Importantly, nothing, nothing that Ms. Dixon said was ever said by the secretary. The secretary has been entirely silent. So I think it's nice, you know, it's all fine. I'm sorry, one moment, please. I think that we lost Attorney Dixon, and she's just coming back in now. Attorney Dixon, are you in the meeting? Yes, I apologize. I hit the wrong button. How long were you out of the meeting, Attorney Dixon? I heard Mr. Roth introduce himself.  I apologize. It's quite all right. These things happen. Mr. Roth, please continue. Okay. So I won't go back unless you ask me to do it. No, there's a transcript. Okay. Thank you. So anyway, so the point is that the secretary has never addressed himself in any rulemaking any of these arguments. So this is all post hoc argument of counsel. So you need to consider it in that regard. And further, Judge McAuliffe, to your point, the government would have to have you believe that Congress brought Puerto Rico hospitals into the IPPS system, stated they're going to be treated to the same and the same extent, and then sub silentio thought that it would be fine to limit the dish payment. But there is nothing. There's nothing in the legislative history. There's nothing that the secretary has ever published. There is nothing in the statute itself that indicates there was any intent on any part to reduce these payments. And as you point out very effectively, what government counsel referred to as the reduced cost was addressed in the 75-25 percent split. So this simply, if that in fact were the secretary's motivation, it would be a double whammy. In other words, not only did he take the information out, the money out in the first instance by only paying you 25 percent of the federal rate, but he would also take it out by not giving you dish. But the important point here about the flexibility under the statute is that the secretary himself in 1987 stated that the statute does not limit the secretary's discretion. In the part of our brief that addressed the outlier provision, which is another one of the provisions that's included in that laundry list of five that government counsel was talking about. Two other points. One, the Medicaid fraction, the idea that somehow the fact that the Puerto Rico hospitals would get paid dish under the Medicaid fraction, a reduced amount but paid under, they should be happy about that. I can tell you this. The secretary has never argued that the 10 states that have a higher Medicaid percentage than Puerto Rico should be satisfied with their Medicaid. So it's just an unworkable. Can I ask you one question? Is there any downside from being brought into the system? Is there any downside? Yeah, you're not paid your cost. No, no, no, no, no, no. In other words, is there any way in which if you were outside the system, you'd be better off than being inside the system? Are you talking about the inpatient prospective payment system? Yeah. The other system is one that pays costs. So whatever cost you have, you get paid those costs. So just so I understand it, would bringing the Puerto Rico hospitals into the system but effectively zeroing out their SSI fraction make them worse off than if they were outside the system? Unquestionably. Because the whole purpose of IPPS, if you remember back to the first term of President Reagan's presidency where there were considerable deficit issues, considerable deficit concerns, and this was a response to put the hospital's inpatient payments into a PPS system where they were paid on predetermined rates, not on their actual costs with an inflation factor. And the whole idea is that in order for that to work for hospitals that treat a lot of low-income patients is they need to have the dish add-on. And you can't give them part of a dish add-on and say, oh, you should be satisfied with that because the IPPS system hinges on that. And there's no opt-out for a hospital from that system? An opt-out from the system? Yeah. No, no, no. There are some hospitals, like cancer hospitals or in-group pediatric hospitals. I mean, there are some hospitals that are not. You're just put into that system, and then that's what you get. Yeah. Yes, Your Honor. Yes. There was no option on that at all. Did you have a second question, Your Honor? No. I know that I'm long out of time, but Judge Howard, if you'd like me to address your question about how the SSI numbers are calculated, I can answer that for you. Would you take a minute and just give your perspective on that? Thank you. Well, remember when I – in response to Judge Barron, I said that HHS takes the Medicare beneficiary data and runs it against an SSI database. And so all inpatient stays for Medicare beneficiaries are bounced against the SSA database. Hospitals know nothing about this. Hospitals are completely – have no access to this information. This is a government determination. And so that's – it's from that matching which will apply if they either have it or not for every Medicare beneficiary wherever they got their services at an IPPS hospital. Our thanks to you both. We'll take the case under advisement. Thank you, Your Honor. That concludes argument in this case. Attorney Roth and Attorney Dixon, you should disconnect from the hearing at this time.